**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**William Howard GARLAND,**
**Defendant–Appellant.**

**No. 92–3566.**

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 29, 1993.

Decided April 19, 1993.

329

Randall E. Yontz (argued and briefed), Office of the U.S. Atty., Columbus, OH, for plaintiff-appellee.

Samuel B. Weiner, Max Kravitz, Columbus, OH, Ramsey Clark (argued and briefed), New York City, for defendant-appellant.

Before: MERRITT, Chief Judge; and GUY and NELSON, Circuit Judges.

MERRITT, Chief Judge.

Defendant, William Howard Garland, appeals his conviction on one count of interstate fraud arising from what he claims was a failed attempt to purchase 5000 metric tons of cocoa beans from Ghana, West Africa.[1] He borrowed $75,000. Garland was indicted and tried on the theory that he had fabricated the cocoa deal and had defrauded the lender by representing that he needed the $75,000 to complete the cocoa shipment to the United States. The Department of Justice did not investigate the facts of the case in Ghana to verify Garland's story prior to seeking the indictment.

---

1. Garland was convicted under 18 U.S.C. § 2314, which includes in relevant part, "Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5000 or more, knowing the same to have been stolen, converted or taken by fraud."

In his defense, Garland testified at trial that he thought he had a legitimate and highly profitable cocoa deal but was defrauded by Ghanian sellers who claimed to represent the Ghana Cocoa Board. Other than Garland's own testimony, there was little evidence presented to the jury in corroboration of his defense. The District Court did not allow a Ghanian police investigator to give testimony in corroboration of Garland's story. New evidence now corroborates Garland's story that he was defrauded and that he did borrow the $75,000 for the purpose of completing the cocoa transaction.

The primary issue we address on appeal is whether evidence discovered after the trial provides sufficient support for Garland's defense to qualify as "newly discovered evidence" under Fed.R.Crim.P. 33.[2] This question, in turn, depends in part on another question: whether a subsequent criminal judgment rendered by the National Public Tribunal of Ghana is subject to judicial notice and admissible in evidence. Both questions should be answered in the affirmative. The subsequent testimony of Tre Anatole, one of Garland's African associates, together with the judgment of the National Public Tribunal of Ghana convicting the Ghanian sellers of fraud against Garland, would likely have resulted in an acquittal had they been presented to the jury. Both pieces of evidence qualify as newly discovered evidence. The conviction should therefore be vacated and the case remanded for further proceedings.

## I.

William Howard Garland is a Columbus, Ohio, businessman who normally buys and sells heavy machine tools and construction equipment. Garland engaged in business in several countries in West Africa and established an office in Abidjan in the Ivory Coast where a sometime associate, Henri Banchi, conducted business. In July 1986, Garland says that he and Banchi negotiated to purchase 5000 tons of cocoa beans from a Ghanian group that claimed to represent the Ghana Cocoa Board. Garland made a trip to Ghana, whose major export is cocoa beans. He met with the cocoa bean sellers to discuss the 5000 ton transaction, and he and Banchi together invested $400,000 to pay for processing, transporting and loading the cocoa. A New York company, which had received a letter of credit from Chase Manhattan Bank, agreed to purchase the cocoa.

Garland says that he had exhausted his own funds when the cocoa sellers contacted him with the news that they needed $50,-000 immediately to have the cocoa loaded onto the ship which was ready to leave. Through a friend, Garland located Raymond Pasco, who had recently sold a business and had access to cash. On August 22, 1986, Pasco went to Garland's house where Garland convinced him to invest $75,000, promising that he would receive back $175,000 just over a month later on September 30 when the sale was completed. Garland testified that he thought he could promise such an enormous profit in such a short time because of the eagerness of the Ghana Cocoa Board to open up markets in the United States. Garland claims that the Cocoa Board discounted the cocoa beans so that his share of the profits alone would have been $500,000. His desire to save the deal, he claims, made him willing to offer a high rate of return to induce Pasco to lend the money immediately so the cocoa beans could be shipped. Garland showed Pasco seven documents that he had received from the sellers which contained the details of the transaction.

Garland sent a check for $45,000 to the Ghanian sellers and had the other $5,000 sent from his Ivory Coast offices. At oral argument, Garland's counsel explained that Garland borrowed $75,000 rather than just

---

**2.** Fed.R.Crim.P. 33, titled, "New Trial" states in relevant part:

> The court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice.... A motion for a new trial based on the ground of newly dis-

> covered evidence may be made only before or within two years after final judgment.... 

> The government does not claim that Garland's motion for a new trial based on newly discovered evidence was untimely.

the $50,000 he needed for shipping because he had exhausted his funds and needed money to cover his extensive travel expense in connection with the cocoa transaction. Garland made several trips to Africa and went to the Netherlands to meet the ship. Garland's cocoa was not on the ship, and in October 1986, when there was still no cocoa delivery, Garland filed a complaint against the sellers in Ghana. Pasco and Garland later entered into a settlement agreement concerning the debt.

The jury obviously believed the prosecution's theory that Garland's story of a cocoa deal in Ghana was an exotic tropical tale of intrigue designed to defraud. It returned a conviction on the single-count indictment against Garland charging him with sending a $45,000 check which was obtained by fraud through interstate commerce. At trial the prosecutor took the position before the jury that the cocoa deal was a complete fabrication,[3] although on appeal the prosecutor admitted that the Department of Justice had not conducted an overseas investigation of the accuracy of the facts which Garland asserts. Five

months after the convictions, the District Court held a hearing at which the defense was allowed to present evidence to support its motion for a new trial and for judgment of acquittal notwithstanding the jury verdict. At the evidentiary hearing, the defense presented witnesses including Tre Anatole, a French speaking West African who was employed by Garland and Banchi in connection with the cocoa transaction. Anatole's testimony supported the defense's claims.[4] He testified that he had delivered a $45,000 check from Garland to the cocoa sellers and testified in detail concerning the formation of the cocoa contract in Ghana. The defense also presented Barry Wilford, Garland's attorney during the trial, who testified that he attempted, but was unable to obtain Tre Anatole's appearance at the trial. Anatole testified that he had been in Cameroon, in Central Africa, at the time of the trial. The District Court, holding that this additional evidence corroborating the defendant's story was not "newly discovered" evidence, denied the motion for a new trial, and sentenced the

---

**3.** The prosecution's theory of the case was that Garland borrowed the $75,000 from Pasco to buy gold, not cocoa. In his opening statement, the prosecutor stated that Garland converted $45,000 of Pasco's loan into CFAs, the currency of Togo, and gave it to the cocoa sellers "specifically for gold purchases, transactions involving gold." Later in the opening statement, the prosecutor reiterated this theory: "Those CFAs then were wired over to Togo, and the same two individuals were given the money in Togo. Not Ghana, not cocoa; Togo for gold."

In his closing statement, the prosecutor continued to argue that Garland lied to Pasco about the cocoa deal. He began by imploring the jury:

Let's take a look at Mr. Garland's story and what he has sought to convince you of. He claims that some $200,000 of his money—well, some of his and some of the other investors that he borrowed from—and indeed another $200,000 from this purported partner, did go through his office, through his bank in the Ivory Coast over to Ghana.

The prosecutor followed by listing evidence including documents, receipts, bank statements, contracts and other items that he claimed would exist if Garland were involved in a cocoa deal, but which he claimed did not exist because Garland was attempting to hide a gold transaction. Later in the closing statement, the prosecutor told the jury that if there was any deal at all, it was one involving Pasco's, and not Gar-

land's, money: "It wasn't his money that was invested, it was Raymond Pasco's $45,000. Not 75, not 200, and not 400. And maybe that deal fell through, but it certainly wasn't bags of cocoa."

At the end of his closing statement, the prosecutor told the jury: "And when you take a look at all of this evidence and you use your common sense, there is no reasonable doubt about what Mr. Garland was up to with Raymond Pasco's money, and it wasn't loading cocoa."

**4.** Tre Anatole, who speaks only French, testified at the evidentiary hearing with the help of an interpreter. Anatole testified that in 1986, the time of Garland's cocoa transaction, he was working for Garland and Banchi, and "was sent to meet the people they wanted to do business with." He further testified that he met with Kwasi Tay and Seth Kwaku, the two individuals who have since been convicted of defrauding Garland, "in order to buy cocoa beans with him [sic]." Anatole also stated that 5000 metric tons of cocoa beans were involved in the transaction, and that he was present when the $45,000 Garland sent from the United States was received and when it was delivered to Tay and Kwaku. He testified that he faxed to Garland the copies of the shipping documents Tay and Kwaku gave him. Anatole said that later, in October, 1986, he make a report to the police in Ghana about the fraud that Tay and Kwaku had perpetrated.

defendant to two years in prison. Defendant brought this appeal.

On December 16, 1992, while this appeal was pending, the National Public Tribunal of Ghana issued a judgment convicting two Ghanians of defrauding Garland of $200,000 by making false representations concerning the cocoa bean transaction. This judgment contains a 19–page recitation of the facts of the case which corroborate the defendant's claims.[5]

## II.

■ The Ghanian judgment is admissible in evidence to prove that it was rendered and as *prima facie* evidence of the facts adjudicated. The defendant has made a

formal request for judicial notice of the judgment under Fed.R.Evid. 201, and the prosecution has not objected, nor has it suggested that the findings of fact by the Ghanian tribunal are wrong, although it still maintains that the conviction should be affirmed. Rule 201 applies to judicial notice of "adjudicative facts." Fed.R.Evid. 201(a). We judicially notice the criminal judgment in Ghana and its existence as an official statement usable in evidence of the facts stated. We do not judicially notice the truth of the statements contained in the Ghana judgment because some of these facts may remain in dispute. *C.f. Ackermann v. Levine*, 788 F.2d 830, 844 (2d Cir.1986) (stating that "courts are not limited to recognizing a [foreign] judgment en-

---

5. A panel of three members of the National Tribunal of Ghana heard the case of "The People vrs. Issac Duff Tay and Seth Kwaku Adzoro." The panel's judgment describes the charges against the defendants first:

> that between June and October 1986 in Accra the accused persons acted together with a criminal purpose in defrauding by false pretences one William Howard Garland a United States of America citizen ... The particulars of the offence were that between the period aforesaid, the accused persons made false representations to William Howard Garland that they were in a position to supply him 5,000 metric tonnes of Ghana Cocoa beans and succeeded in defrauding him on divers occasions of a total amount of USD 400,000.

The judgment then discusses the facts of the case, reciting the prosecution's essentially uncontradicted version first. The judgment describes the meeting between Garland and the defendants, who presented themselves as officials of the Ghana Cocoa Marketing Board, and notes that "[o]n the assurances by the accused persons that a genuine business avenue was unfolding, the complainant flew back to the U.S.A. to arrange for funds for the purchase of cocoa." The judgment then describes the false documents the defendants prepared for Garland, and how they "demanded and obtained US $400,000 which they said was to be paid in advance to the cocoa farmers and other persons for bagging and loading the cocoa."

The prosecution called three witnesses, Garland and two detectives who had worked on the case. The judgment discusses Garland's testimony, which recounted the same version of the facts as Garland has presented to us. The second prosecution witness, a criminal detective, presented into evidence without objection statements made by the defendants during the investigation, as well as an affidavit from Tre Anatole, and a statement from Henri Banchi. The third prosecution witness, a handwriting expert,

testified that several documents relating to the cocoa transaction, including a letter, a receipt and a sworn statement, were in the handwriting of defendant Tay.

The defendants testified briefly, denying all the charges. The Tribunal panel concluded, however, that the defendants' statements were "not supported by the overwhelming evidence to the contrary made available before the tribunal." The judgment notes that Banchi's statement "supports in all material respects the allegations made by [Garland] against the accused persons," and that Tre Anatole's sworn affidavit "also supported the evidence of [Garland] against the accused persons to the hilt." In one affidavit, defendant Tay claimed that he received only $50,000 from Garland, but the Tribunal panel found that this was a "gross lie" because the prosecution presented a receipt signed by Tay which said that he had received $200,000 from Garland. The judgment states that "the position of [defendant Adzoro] is in no way better than that of [Tay]." The judgment then states the Tribunal's findings:

> The evidence is thus abundantly clear that [Tay and Adzoro] used deception as a tool in making [Garland] to part with substantial sums of monies which he otherwise would have not. This under our laws amounts to defrauding by false pretenses as per count 2 of the charge against the accused persons. The tribunal holds as a matter of law that the prosecution has proved count 2 against [Tay and Adzoro] beyond all reasonable doubt. The tribunal accordingly finds [Tay and Adzoro] guilty on that count and convicts them accordingly though in respect of the lesser amount of $200,000 and not the $400,000 as per count 2 of the charge sheet.

The Tribunal sentenced each defendant to a fine of $125,000, and ten years in prison should they fail to pay. Of this $250,000 in fines, $245,000 was to be paid to Garland.

tirely or not at all," and that courts may recognize discrete components of a foreign judgment). What is not in dispute between the parties is the existence of the judgment and the fact that the Ghana criminal court has made detailed findings of fact on issues relevant to the case at hand.

 This ruling fits comfortably within the principles (1) that in criminal cases, the parties may contest facts judicially noticed,[6] (2) that official statements of facts may be judicially noticed even though the truth of statements therein is not noticed,[7] and (3) foreign judgments, documents and records of "regularly conducted activity" may be used in evidence in criminal cases. 18 U.S.C. §§ 3491, 3505.[8] The content of the proposition to be noticed is limited to the existence of detailed official findings of fact by the court in Ghana, findings which are relevant to the defendant's claim of no intent to defraud.

*Ennis v. Smith*, 55 U.S. (14 How.) 400, 429–30, 14 L.Ed. 472 (1852) is a case in point. It holds that a federal court, after judicially noticing the existence of a foreign judgment, may conclude that the family relationships found by the foreign tribunal should guide the federal court in determining the outcome of a will contest. There the Congress in 1798 granted a substantial sum for wartime service to General Kosciusko, the Polish Revolutionary War hero. The money was held and invested by the General's friend, Thomas Jefferson, until 1817 when the General died in France. Jefferson then turned the money over to the Attorney General, and much later a will contest ensued between Kosciusko's next of kin in Lithuania (part of Poland when Kosciusko was born, later part of Russia) and certain French legatees of Kosciusko's will probated in France. The Supreme Court, reversing the lower court, based its findings that the Lithuanian relatives were the next of kin upon findings made in judicial proceedings in Lithuania in 1843.[9]

---

**6.** Rule 201(g), Fed.R.Evid. provides that as to "adjudicative facts": "In a criminal case, the court shall instruct the jury that it may, but is not required to, accept as conclusive any fact judicially noticed."

**7.** See Judge Hand's ruling in *United States v. Aluminum Co. of America*, 148 F.2d 416, 446 (2d Cir.1945), that the court could properly notice the report of a congressional committee as an official statement usable in evidence of the facts stated, but not the truth of the statement; a rule approved and further explained in Morgan, Basic Problems of Evidence, Vol. 1, p. 13 (1957).

**8.** These statutes address the use of foreign documents in United States criminal cases. 18 U.S.C. § 3491, "Foreign Documents," provides that "[a]ny book, paper, statement, record, account, writing, or other document, or any portion thereof, of whatever character and in whatever form ... shall ... be admissible in evidence in any criminal action or proceeding in any court of the United States" if duly certified and authenticated.

18 U.S.C. § 3505, "Foreign Records of Regularly Conducted Activity," provides:

(a)(1) In a criminal proceeding in a court of the United States, a foreign record of regularly conducted activity, or a copy of such record, shall not be excluded as evidence by the hearsay rule if a foreign certification attests that—

(A) such record was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;

(B) such record was kept in the course of a regularly conducted business activity;

(C) the business activity made such a record as a regular practice; and

(D) if such record is not the original, such record is a duplicate of the original; unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Subsection (c)(1) defines "foreign record of regularly conducted activity" to include "a memorandum, report, record, or data compilation in any form, of acts, events, conditions, opinions, or diagnoses, maintained in a foreign country." Subsection (c)(3) defines "business" as including "business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

**9.** Justice Wayne's opinion discussed the effect of the foreign judgments as follows:

It has been proved that he [Kosciusko] survived his parents, died without issue, and that these complainants are the lineal descendants of two of his sisters, one of whom died before her brother, and the other afterwards.

The fact of their relationship, notwithstanding the objection which was made to the proof of it, is sufficient. The proofs are decrees of the Court of Nobility, of the Government of Grodno, and another of the Court of Kobryn, in the Russian province of Lithuania. The originals are in the Orphans' Court, and were filed in it, in the regular course of judicial proceeding. Both of them are authenticated

This same principle of judicial notice of foreign judgments was recognized later in a Third Circuit case. *Lloyd v. American Export Lines, Inc.,* 580 F.2d 1179 (3rd Cir.), *cert. denied,* 439 U.S. 969, 99 S.Ct. 461, 58 L.Ed.2d 428 (1978), was an unseaworthiness action against a shipowner by a crew member who was injured in a fight. The jury found the shipowner negligent and awarded the crew member damages. *Id.* at 1181. On appeal, the Third Circuit held that the district court erred by not admitting into evidence a Japanese criminal conviction of the crew member for his role in the fight. *Id.* at 1190. After noting that the Japanese judgment was relevant because it "covered the precise altercation which constituted the centerpiece of [the] civil claim," *id.* at 1188, and that it was "not asked in this case to give conclusive effect to the Japanese conviction," *id.* at 1190, the Court admitted the judgment into evidence under Fed.R.Evid. 803(22).[10] *Id.*

This rule that judgments may be noticed and used as *prima facie* evidence of the facts stated therein has been applied to judgments of domestic courts in the United States. *See, e.g., Moses v. United States,* 166 U.S. 571, 600, 17 S.Ct. 682, 693, 41 L.Ed. 1119 (1896) (holding that a judgment recovered against a non-party principal by the government was properly admitted in evidence against the surety of a bond and stating: "It proved, at least *prima facie* a breach of the bond ... and, unexplained, the judgment was sufficient evidence of the breach of condition."); *Merchant's Mortgage Company v. Bogan,* 434 F.2d 490, 493 (D.C.Cir.1970) (holding that a prior foreclosure judgment was properly admitted as *prima facie* evidence in the mort-

gage company's suit against the mortgage guarantor even though it was not given full *res judicata* effect). *See also, Drummond v. Prestman,* 25 U.S. (12 Wheat.) 515, 519, 6 L.Ed. 712 (1827) (holding that the record of a prior judgment in an action by plaintiff against defendant's son "was certainly competent to prove a fact which every judgment is competent to prove between any parties, to wit, that such a judgment was obtained between certain parties, on a certain cause of action."); *Southern Ry. Co. v. Bouknight,* 70 F. 442, 448 (4th Cir.1895) (holding in a mortgage case that a prior judgment was admissible, "not simply as establishing the fact of its own rendition, but as proof of when action was brought, what for, and the amount").

■ To the objection that the facts found by the Tribunal in Ghana are inadmissible as hearsay, there are two answers. First, 18 U.S.C. § 3505 provides that "in a criminal proceeding in a court of the United States, a foreign record of regularly conducted activity ... shall not be excluded as evidence by the hearsay rule" if certain elements of "trustworthiness" are present.[11] There is no indication that the records presented in the instant case are unreliable or that the process by which the record was made is untrustworthy.

■ Second, in *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988), the Supreme Court held that Fed.R.Evid. 803(8), covering the public records exception to the hearsay rule, does not create a distinction between facts and opinions contained in public records, *id.* at 164, 109 S.Ct. at 447, and that portions of investigatory reports containing factual in-

---

copies of judicial proceedings in the courts from which they are brought. The competency of the jurisdiction of those courts, in the matters decided in the decrees, is proved by witnesses skilled in the law of the governments of Lithuania. Lithuania we know now to be a Russian province, governed by its own laws, except as they may be modified by the Emporer's edicts. It is divided into three governments, Wilna, Grodno, and Minsk, with a Governor–General over them. The decree of the Assembly of the Department of Grodno, is an exemplified copy of that made on the 7th May, 1843, in the case of the heirs of Koscius-

ko, and contains the genealogical chart of the descendants of the sisters of Kosciusko.
55 U.S. (14 How.) at 429–30.

**10.** Rule 803(22) provides an exception to the hearsay rule for "[e]vidence of a final judgment ... adjudging a person guilty of a crime punishable by death or imprisonment in excess of one year, to prove any fact essential to sustain the judgment...." The advisory committee's note to this rule states that such a judgment is "admissible in evidence for what it is worth."

**11.** *See supra* footnote 8.

formation are admissible under 803(8)(C) despite the fact that they may state a conclusion or opinion. *Id.* at 170, 109 S.Ct. at 450. The ultimate burden of showing lack of trustworthiness as a reason for inadmissibility is on the opponent of the evidence. *Baker v. Elcona Homes Corp.*, 588 F.2d 551, 558 (6th Cir.1978). "[I]t goes without saying that the ultimate safeguard [is] the opponent's right to present evidence tending to contradict or diminish the weight of these conclusions." *Beech Aircraft*, 488 U.S. at 168, 109 S.Ct. at 449.

 As with records falling under the public records exception, a foreign judgment that shows no sign of being unreliable should be admitted. The dual justifications for the public records exception, "the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record," Fed.R.Evid. 803 advisory committee's note, as well as the reliability gained from regularly conducted activities generally, apply to the foreign judgment at issue here. As with public records, there is no reason to distinguish between facts and "opinions" contained in foreign judgments. Except where foreign judgments appear to lack trustworthiness, the burden should be on the party opposing their admission to show lack of trustworthiness. Once admitted, foreign judgments should be treated as *prima facie* evidence of the facts and opinions contained therein. The opposing party, of course, will have the opportunity to rebut these facts and opinions with evidence of its own.

 The Ghanian judgment so noticed judicially constitutes evidence requiring a new trial "in the interest of justice" and as newly discovered evidence. A court may grant a defendant a new trial if "the interest of justice" requires, and newly discovered evidence may provide such a reason. Fed.R.Crim.P. 33. To obtain a new trial based on newly discovered evidence, a defendant must normally show that the evidence (1) was discovered only after trial, (2) could not have been discovered earlier with due diligence, (3) is material and not merely cumulative or impeaching, and (4) would

likely produce an acquittal if the case were retried. *United States v. White*, 861 F.2d 994, 997–98 (6th Cir.1988), (repeating the test set forth in *United States v. Barlow*, 693 F.2d 954 (6th Cir.1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2124, 77 L.Ed.2d 1304 (1983)).

 The December 16, 1992 judgment of the National Tribunal of Ghana is dramatic and probative newly discovered evidence that goes to the issue of Garland's intent to defraud Raymond Pasco. As judicially noticed, the judgment is *prima facie* evidence that Garland made a cocoa deal with Issac Duff Tay and Seth Kwaku Adzoro, and that these men were convicted in Ghana of defrauding him in connection with that cocoa deal. The Ghanian judgment fits squarely within the *Barlow* criteria for newly discovered evidence. It was not entered until after Garland's conviction and thus could not have been "discovered" earlier. It is clearly material to the issue of Garland's intent, and would likely have produced an acquittal had the jury been aware of it.

 Both independently, and in light of the Ghanian judgment, Tre Anatole's testimony at the evidentiary hearing also meets the *Barlow* standard for granting a new trial based on newly discovered evidence. First, although the defense knew of Anatole's existence before and during the trial, Anatole was not located until after the trial. Also, in light of the recent Ghanian conviction, Anatole's testimony at the evidentiary hearing assumes new importance because it provides a verifying link between Garland's story and the findings of the National Tribunal of Ghana.

Second, Anatole was in Cameroon at the time of the trial and had no contact with Garland or his attorneys. As Barry Wilford, Garland's trial attorney, testified at the evidentiary hearing, Garland's attorneys tried to find Anatole, even requesting a continuance to do so, but could not locate him. Under these circumstances, this satisfied the due diligence requirement. *See Mejia v. United States*, 291 F.2d 198, 200 (9th Cir.1961) (defendant exercised due diligence in attempting to locate a witness

when the witness' uncle was absent in Mexico at the time of the trial and thus was not available to correct confusion about the witness' correct name).

Third, Anatole's testimony is obviously material. It corroborates Garland's story and thus helps establish his defense. Anatole testified in detail as to his involvement with the failed cocoa transaction, and related exactly how the money that Garland borrowed from Pasco was transferred to Tay and Kwaku in Ghana. *See, supra* note 4. Newly discovered evidence that is merely cumulative does not require a new trial, "[b]ut that principle should not be applied where ... a disinterested witness becomes available who can supply evidence of vital importance and the only similar evidence at the trial was that of the defendant himself." *Amos v. United States*, 218 F.2d 44, 44 (D.C.Cir.1954).

Finally, Anatole's testimony will likely result in an acquittal since it verifies Garland's defense. It provides persuasive evidence that Garland believed he had a legitimate cocoa deal and thought he really could pay Pasco back when he said he would. If so, a reasonable jury could not find the intent necessary for fraud.

As a result of our disposition of the judicial notice and newly discovered evidence questions, we need not decide whether the prosecutor violated Garland's due process rights in his conduct of the trial. It is indeed unfortunate that the prosecution did not take the trouble to investigate the case in Ghana in order to determine the accuracy of the facts Garland presented. This case illustrates the reason the Department of Justice should thoroughly investigate its cases and not simply assume that the accused is not telling the truth when his story is difficult to verify immediately.

Garland's conviction is **VACATED** and the case is **REMANDED** for further proceedings in accordance with this decision.