PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

  *Plaintiff-Appellee,*

v.

VESELIN VIDACAK,

  *Defendant-Appellant.*

No. 07-4904

Appeal from the United States District Court
for the Middle District of North Carolina, at Durham.
N. Carlton Tilley, Jr., District Judge.
(1:06-cr-00278-NCT)

Argued: October 29, 2008

Decided: January 23, 2009

Before WILKINSON and DUNCAN, Circuit Judges,
and Richard D. BENNETT, United States District Judge for
the District of Maryland, sitting by designation.

Affirmed by published opinion. Judge Bennett wrote the opinion, in which Judge Wilkinson and Judge Duncan joined.

## COUNSEL

**ARGUED:** J. Scott Coalter, MCKINNEY & JUSTICE, P.A., Greensboro, North Carolina, for Appellant. Patrick Auld, OFFICE OF THE UNITED STATES ATTORNEY, Greens-

boro, North Carolina, for Appellee. **ON BRIEF:** Anna Mills Wagoner, United States Attorney, Greensboro, North Carolina, for Appellee.

---

## OPINION

BENNETT, District Judge:

Veselin Vidacak appeals his conviction on four counts of making materially false statements orally and on his United States immigration applications in violation of 18 U.S.C. § 1546(a) and 18 U.S.C. § 1001(a)(2), specifically failing to report any military service in the Army of the Republika Srpska (the "VRS") during the Bosnian Civil War. At trial, the district court received into evidence certain military records and the testimony of two government witnesses concerning translated statements made by Vidacak. All three sources of evidence indicated that Vidacak had in fact served in the VRS. Vidacak contends that the district court erred in admitting these sources of evidence. Because the district court did not abuse its discretion in admitting the evidence at issue, we affirm.

I.

Veselin Vidacak was born in present-day Bosnia, on July 3, 1974. (J.A. 393.) In the late 1990s, Vidacak was residing with his family in Serbia when he decided he would attempt to emigrate to the United States. With the assistance of the International Organization of Migration (IOM), a refugee aid organization, Vidacak filed a Registration for Classification as Refugee Application (Form I-590). (J.A. 414-16.) In March 2002, Vidacak was interviewed by U.S. Immigration Officer Susan Tierney in Belgrade, Serbia, as part of the refugee application process. (J.A. 417.) The interview was conducted with the assistance of a Serbian translator named Dusanka

Bucou, or "Duchka," who was employed by the IOM. (J.A. 321.) After the interview, Vidacak and his family were granted refugee status and they arrived in the United States on July 8, 2002. (J.A. 418-19.) In August of 2003, Vidacak submitted his Application to Register Permanent Residence or Adjust Status (Form I-485). (J.A. 420.) In both of his refugee applications, Forms I-590 and I-485, Vidacak failed to report any military service in the Army of the Republika Srpska (the "VRS") during the Bosnian Civil War. (J.A. 315-25; Gov't Exh. 15.)

The International Criminal Tribunal for the Former Yugoslavia (the "ICTY") in The Hague investigates alleged war crimes that occurred during the civil war fought between the ethnic Serb-dominated Republika Srpska and the Federation of Bosnia-Herzegovina (led by Muslims and ethnic Croatians). (J.A. 33-39.) The ICTY launched an investigation into the July 1995 Srebrenica massacre, wherein elements of the VRS, primarily from the Zvornik and Bratunac Brigades, over-ran a United Nations safe-area and executed thousands of Bosnian Muslims. (J.A. 39-41.) In the spring of 1998, ICTY agents executed a search warrant at the Zvornik Brigade headquarters and seized various military records. (J.A. 44, 254.) ICTY analysts used the records to catalogue the names of VRS soldiers who were connected to the events at Srebrenica and the results were provided to the Department of Homeland Security's Department of Immigration and Customs Enforcement ("ICE"), to be cross-referenced against a database of refugees. (J.A. 264-65.) As a result of its inquiry, ICE determined that Vidacak served in the Zvornik Brigade of the VRS. (J.A. 185-92, 271-78.)

On December 11, 2006, ICE agents arrested Vidacak at his home in Guilford County, North Carolina. (J.A. 341-46.) Vidacak was taken into custody and questioned by ICE Special Agent Rodney Coulston through a U.S. government-contracted interpreter named Carmen Ess. (J.A. 341-88.) Vidacak waived his *Miranda* rights and admitted that he had

served in the VRS during the Bosnian Civil War and that he knowingly had falsified his immigration applications to conceal his service. (J.A. 345-53, 356-65, 383-84.)

Vidacak was charged in a four count indictment for misstating orally and on his Forms I-590 and I-485 immigration applications that he had never served in the military when he had served as a soldier in the Zvornik Brigade of the VRS from May 1, 1993, to July, 1995. (J.A. 9-12.) Vidacak pled not guilty and the matter was set for trial.

Vidacak filed a motion *in limine* objecting to the introduction of his statements made through interpreters to Officer Tierney on March 11, 2002, and to Agent Coulston on December 11 and 12, 2006, contending that the interpreters should be available for cross-examination at trial. (Paper No. 12.) In addition, Vidacak moved to exclude the military documents seized from the Zvornik Brigade headquarters for being improperly authenticated pursuant to Fed. R. Evid. 901 and for being inadmissible hearsay. The district court held a joint pretrial hearing for Vidacak and two similarly-situated defendants.[1] (J.A. 17-176.) During the trial, the district court held that the military records and testimony concerning Vidacak's statements to Tierney and Coulston were admissible. (J.A. 155-56, 166.)

The Government presented testimony from four witnesses that are relevant to this appeal. Richard Butler, a military analyst at the ICTY, testified to demonstrate the authenticity of the military records from the Zvornik Brigade headquarters and explained his involvement in their seizure, cataloguing, and storage. (J.A. 41-51, 74-126, 212-42, 247-302.) Immigration Officer Susan Tierney testified about her 2002 interview with Vidacak in Belgrade. (J.A. 303-37.) Officer Tierney identified her interpreter, Duchka, and attested to her honesty

---

[1] The appeal of one of these defendants is decided in the related case of *United States v. Pantic*, No. 07-4926 (4th Cir. Jan. 23, 2009).

and ability; however Duchka did not appear in person. (J.A. 320-21, 331-36.) ICE Special Agent Rodney Coulston testified with respect to a *Miranda* waiver executed by Vidacak and the process of the interview which was conducted with the assistance of interpreter Carmen Ess. (J.A. 345-47.) Ess testified that she accurately translated the comments made during Vidacak's post-arrest interview. (J.A. 383-84, 388.) On May 3, 2007, a jury returned verdicts of guilty on all four counts. (J.A. 486.) Vidacak timely filed his notice of appeal on September 14, 2007. (J.A. 493.)

## II.

We "review decisions to admit evidence for abuse of discretion." *United States v. Forrest*, 429 F.3d 73, 79 (4th Cir. 2005). *Accord United States v. Bostian*, 59 F.3d 474, 480 (4th Cir. 1995); *United States v. Russell*, 971 F.2d 1098, 1104 (4th Cir. 1992). "Under the abuse of discretion standard, this Court may not substitute its judgment for that of the district court; rather, [it] must determine whether the [district] court's exercise of discretion, considering the law and the facts, was arbitrary or capricious." *United States v. Mason*, 52 F.3d 1286, 1289 (4th Cir. 1995).

## III.

At trial, over defense objection, the Government introduced several foreign military documents. (J.A. 276.) Government's exhibit #2 (with corresponding English translation as Government's exhibit #1) reflects a list of individual soldiers from the 2nd Infantry Battalion of the Zvornik Infantry Brigade for the month of July, 1995. (J.A. 275.) Government exhibit #5 (along with a one page extract as Government's exhibit #3) is a personnel administrative log of the 2nd Infantry Battalion of the Zvornik Infantry Brigade. (J.A. 275, 289.) Government's exhibit #4 is a mobilization card from the former Yugoslav's People's Army ("JNA"), now the Army of the Republic of

Srpska. (J.A. 275.) These documents were introduced for purposes of proving that Vidacak served in the VRS.

Each of these exhibits was introduced through the testimony of Richard Butler of the ICTY who participated in a search of the Zvornik Brigade headquarters in the spring of 1998. (J.A. 254, 276.) Butler described his role in the execution of a search warrant that authorized the seizure of "all military documents created during the course of the [Bosnian Civil War] from April 1992 through December 1995." (J.A. 43.) Butler testified as to how numerous documents were seized and taken to the War Crimes Tribunal in The Hague, where they were later catalogued. (J.A. 254-63.) Butler identified each of the Government's exhibits as being seized during the 1998 search of the Zvornik Brigade headquarters. (J.A. 273.) However, Butler stated that the first time he saw Vidacak's name was in the summer of 2004, and that he could not remember specifically seeing these documents when he searched the headquarters. (J.A. 88, 286-87.) He testified that the documents were present in Zvornik during the search, based on the electronic registration number ("ERN") system and ICTY document cataloguing procedures. (J.A. 94-95.) On cross-examination, Butler acknowledged he could not "talk about [the history of these documents prior to their seizure by the ICTY in 1998] in first person terms." (J.A. 287.)

Vidacak argues that the district court abused its discretion by admitting at trial the three exhibits of VRS military documents seized from the Zvornik Brigade headquarters.[2] He claims that the Government did not submit evidence sufficient to make a *prima facie* case that the "documents were created prior to July 1995 having some relevance as to whether Vidacak was in the military." (Appellant Br. 15-16.) He notes that the Government failed to account for the approximate three

---

[2]The related case of *United States v. Pantic*, No. 07-4926 (4th Cir. Jan. 23, 2009), concerns this same issue with respect to the admissibility of military documents seized from the Zvornik headquarters.

year gap between the creation of the documents and their seizure in 1998. (*Id.* at 16.) In addition, Vidacak claims that the records constituted inadmissible hearsay under Fed. R. Evid. 802 with no applicable exception. (*Id.* at 16-17.)

A.

To establish that evidence is authentic, a proponent need only present "evidence sufficient to support a finding that the matter in question is what the proponent claims." Fed. R. Evid. 901(a). The factual determination of whether evidence is that which the proponent claims is ultimately reserved for the jury. *United States v. Branch*, 970 F.2d 1368, 1370 (4th Cir. 1992). The district court's role is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic. *See id.* at 1371; *United States v. Safavian*, 435 F. Supp. 2d 36, 38 (D.D.C. 2006) ("[t]he Court need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the *jury* ultimately might do so") (emphasis in original). The burden to authenticate under Rule 901 is not high—only a *prima facie* showing is required. *See United States v. Caldwell*, 776 F.2d 989, 1002 (11th Cir. 1985) ("Once that *prima facie* showing has been made, the evidence should be admitted, although it remains for the trier of fact to appraise whether the proffered evidence is in fact what it purports to be."); *United States v. Goichman*, 547 F.2d 778, 784 (3d Cir. 1976) ("There need only be a *prima facie* showing, to the court, of authenticity, not a full argument on admissibility"). *See also*, Weinstein's Federal Evidence § 901.02[3] (2008) ("Generally speaking, the proponent of a proffered exhibit needs only to make a *prima facie* showing that the exhibit is what the proponent claims it to be.").

The district court did not abuse its discretion in finding that the Government had satisfied its burden of authentication. Richard Butler's testimony was independently sufficient to

support a *prima facie* case that the military documents were authentic Zvornik Brigade records. Butler testified in detail about his role in the seizure of these documents from the Zvornik Brigade headquarters. (J.A. 41-47.) He recognized the exhibits based upon the evidence control numbers that his team affixed to the documents and he described their subsequent indexing, computer-scanning, and storage. (J.A. 43-51, 48-49, 94-95.) Butler also outlined the VRS's administrative practices and explained how the VRS "almost wholesale maintained the general practices and procedures and regulatory methods that the JNA had used . . . since the end of World War II, so in most cases . . . the documents [the ICTY found] with the [VRS], you can actually trace them back to administrative or operations manuals, tactical or doctoral [sic] manuals of the former JNA." (J.A. 69-70.)

The methods employed by the Government to support the records' authenticity comport with several of the illustrative examples provided in Fed. R. Evid. 901(b). Butler's testimony fits the "broad spectrum" of Rule 901(b)(1)'s provision for "[t]estimony of [a] witness with knowledge" that the documents are what they are purport to be, *i.e.*, VRS records from the Bosnian Civil War period. Fed. R. Evid. 901 Advisory Note to Subdivision (b). In addition, the "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics" of the records, "taken in conjunction with circumstances" of their seizure, reinforce the authentication ruling pursuant to Fed. R. Evid. 901(b)(4). Finally, the exhibits constitute "[p]ublic records or reports under Fed. R. Evid. 901(b)(7) in that they are "purported public record[s], report[s], statement[s], or data compilation[s], in any form . . . from the public office where items of this nature [were] kept."

Vidacak argues that the authenticity of the records was never established since the Government never accounted for the history of the documents prior to the date of their seizure. In support of his case, Vidacak relies primarily upon *United States v. Perlmuter*, 693 F.2d 1290 (9th Cir. 1982), in which

certain foreign documents were held to be improperly authenticated. In *Perlmuter*, the United States sought to authenticate documents created by Interpol that purported to represent the defendant's criminal history in Israel. The testifying U.S. immigration officer had requested the documents but was not personally familiar with them. The district court held that while the records did not comply with Rules 901 or 902(3), they were admissible based upon their "aura of authenticity." *Id.* at 1292. The Ninth Circuit reversed, stating that the Federal Rules of Evidence permit authentication under either Rule 901 or 902, but "offer no third means of authentication; certainly it is not enough that the documents present an 'aura of authentication.'" *Id.* at 1293.

The facts in *Perlmuter* are clearly distinguishable from the facts in Vidacak's case, where the district court properly found that the records were admissible under Rule 901. Unlike the records in *Perlmuter*, which were produced in response to an inquiry related to the defendant, the records in this case were seized directly from the office of a foreign government and, both on their face and through the testimony of a person familiar with such records, were identifiable as records of that foreign government. Because the issue of authenticity is very fact-specific, the Ninth Circuit's ruling in *Perlmuter* is of negligible import in our analysis.

Moreover, the burden of authentication is not as demanding as suggested by Vidacak—a proponent need not establish a perfect chain of custody or documentary evidence to support their admissibility. *United States v. Cardenas*, 864 F.2d 1528, 1531 (10th Cir. 1989) ("deficiencies in the chain of custody go to the weight of the evidence, not its admissibility; once admitted, the jury evaluates the defects and, based on its evaluation, may accept or disregard the evidence."). Indeed, the *prima facie* showing may be accomplished largely by offering circumstantial evidence that the documents in question are what they purport to be. *See, e.g.*, *United States v. Dumeisi*, 424 F.3d 566, 575-76 (7th Cir. 2005) (holding that documents

of the Iraqi Intelligence Service were properly authenticated by circumstantial evidence and witness testimony); *United States v. Elkins*, 885 F.2d 775, 785 (11th Cir. 1989) ("Use of circumstantial evidence alone to authenticate a document does not constitute error.").

Sufficient circumstantial evidence exists in this case, despite the fact that the Government could not trace the precise history of the documents prior to their seizure. *See, e.g.*, *United States v. Demjanjuk*, 367 F.3d 623, 631-32 (6th Cir. 2004) (holding that foreign documents were sufficiently authenticated by supporting circumstantial evidence, even if their origin could not be proven); *Elkins*, 885 F.2d at 785-86 (holding that circumstantial evidence of where documents were found (in West Germany, in the briefcase of a Libyan arms dealer) was sufficient to authenticate documents in the absence of any evidence of forgery). The documents at issue were discovered in a place where they would be expected to be found—the Zvornik Brigade headquarters that was still functioning at the time of the search. (J.A. 113-117.) They bore unique indexing numbers that rendered them readily identifiable as VRS records that dated to the period of the Bosnian Civil War. (J.A. 94-95, 276-78.) Moreover, Butler explained that the VRS, like most military entities, had a vested interest in keeping records on its soldiers for accountability purposes and to determine eligibility for benefits. (J.A. 263.) Vidacak, on the other hand, has offered no basis for inferring that the exhibits were forged or altered that would arouse this Court's suspicion as to their authenticity.

### B.

Vidacak's hearsay objection also falls short as the records clearly fall within the hearsay exception of Fed. R. Evid. 803(8) in that they constitute "[r]ecords, reports, statements, or data compilations, in any form, of public offices of agencies, setting forth (A) the activities of the office or agency

. . . ." Fed. R. Evid. 803(8). Courts regularly admit foreign records pursuant to this exception. *See, e.g.*, *Demjanjuk*, 367 F.3d 623, 631 (6th Cir. 2004) (Nazi German Service Identity Card); *United States v. Garland*, 991 F.2d 328, 334-35 (6th Cir. 1993) (Ghanian judgment); *United States v. Grady*, 544 F.2d 598, 604 (2d Cir. 1976) (Northern Ireland constabulary firearms report).

No foundational testimony is required in order to admit evidence under Rule 803(8). *See, e.g.*, *United States v. Doyle*, 130 F.3d 523, 546 (2d Cir. 1997); *United States v. Loyola-Dominguez*, 125 F.3d 1315, 1318 (9th Cir. 1997). Nevertheless, Butler's testimony not only supported the records' authenticity, but also reinforced their qualification under the hearsay exception. As noted, Butler attested to how these documents were seized from the Zvornik Brigade headquarters, where documents of this sort were expected to be found. Butler also explained how the VRS maintained and organized such records in accordance with the procedures it adopted from the JNA. Finally, the records on their face reflect that they were created by the VRS to memorialize its activities.[3]

IV.

Officer Susan Tierney testified in detail about her role in the refugee application process in Belgrade in 2002 and Vidacak's refugee interview. (J.A. 307-14.) Tierney identified: (1) Vidacak's I-590, "that [she] went over when [she] was interviewing [him]" (Gov't Exh. 12); (2) his "sworn statement of refugee applying for admission into the United States . . . that [she] had every applicant go over" (Gov't Exh. 13); and (3)

---

[3]Vidacak argued that because the foreign military documents were inadmissible, his confession was also inadmissible because "an extrajudicial confession must be corroborated as to the *corpus delicti*." (Appellant Br. 17 (quoting *United States v. Sapperstein*, 312 F.2d 694, 696 (4th Cir. 1963))). However, because we hold that the district court did not err in admitting the VRS records, Vidacak's *corpus delicti* claim is moot.

the "Refugee Application Assessment . . . where [she] put [her] notes during the interview [with Vidacak]" (Gov't Exh. 14). (J.A. 315-23.) Tierney pointed out notes that confirmed that she "questioned Mr. Vidacak about whether he had served in the military." (J.A. 323.) Interpreter Duchka, who assisted Tierney in interviewing Vidacak, was identified on his I-590. (J.A. 320-21.) Tierney testified that Duchka "seemed extremely honest" and "was one of the best translators that [she] had come across." (J.A. 335, 467.)

Vidacak contends that Officer Tierney's testimony about the 2002 interview was inadmissible double hearsay since she was not relating the statements of Vidacak but instead the out of court statements of the IOM interpreter, Duchka, who did not testify at trial. (Appellant Br. 19.) However, Duchka's translations did not create double hearsay because Duchka was merely a "language conduit" and not a declarant under the hearsay rule.

Both parties rely upon *United States v. Martinez-Gayton*, 213 F.3d 890 (5th Cir. 2000) as the central case dealing with the hearsay rule and interpreters. In *Martinez-Gayton*, the United States Court of Appeals for the Fifth Circuit noted that "except 'in unusual circumstances, an interpreter is no more than a language conduit and therefore his translation does not create an additional level of hearsay.'" *Id.* at 892 (quoting *United States v. Cordero*, 18 F.3d 1248, 1252 (5th Cir. 1994)). From this general rule, some courts have carved out a narrow exception that is applied "where the particular facts of a case cast significant doubt upon the accuracy of a translated confession." Four factors have been identified by courts to determine whether this exception applies: "1) which party supplied the interpreter; 2) whether the interpreter had a motive to mislead or distort; 3) the interpreter's qualifications and language skills; and 4) whether actions taken subsequent to the conversation were consistent with the statements translated." *Martinez-Gayton*, 213 F.3d at 892 (citing *United States v. Nazemian*, 948 F.2d 522, 525-27 (9th Cir. 1991)). The Fifth

Circuit concluded that "where the particular facts of a case cast significant doubt upon the accuracy of a translated confession, the translator or a witness who heard and understood the untranslated confession must be available for testimony and cross-examination" before the statement can be admitted. *Id.* at 891.

Applying the factors set forth in *Martinez-Gayton* to the record, we hold that application of the narrow exception is not warranted in this case and the translation did not create an additional level of hearsay. Duchka was an employee of the IOM, which is an independent United Nations-funded agency that assists refugees; there is no indication that she was selected by the United States government. In addition, there is no evidence suggesting that Duchka harbored any bias against Vidacak, or that she had any motive to mislead or distort. The record reflects that Duchka was highly skilled and reliable and Officer Tierney testified that Duchka was one of the best interpreters with whom she had ever worked. Finally, Vidacak later confessed in his post-arrest interview that he had served in the VRS and that he had knowingly omitted any mention of his military background on his immigration applications. (J.A. 350-53.) Accordingly, we conclude that the interpreter Duchka was, under the circumstances of this case, no more than a "language conduit" and that Officer Tierney's testimony was not double hearsay.

Finally, we hold that Vidacak's statements to Officer Tierney were not hearsay for two independent reasons: (1) they qualified as party admissions under Fed. R. Evid. 801(d)(2); and (2) they were not offered "to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Indeed, the statements that Officer Tierney testified Vidacak made through the interpreter were offered for the falsity of the matter asserted—in other words, they were introduced to show that Vidacak had lied during his application interview. *See Anderson v. United States*, 417 U.S. 211, 219-20 (1974) (concluding that statements were not hearsay when "the point of the prosecu-

tor's introducing [the] statements was simply to prove that the statements were made so as to establish a foundation for later showing, through other admissible evidence, that they were false.").

## V.

ICE Agent Coulston testified that after he arrested Vidacak, he obtained a *Miranda* waiver and conducted an interview with the assistance of interpreter Ess. (J.A. 345-47.) Agent Coulston read from a prepared question form and Ess interpreted his questions and Vidacak's answers. (J.A. 347.) Vidacak stated that he had served as a soldier in the VRS, and acknowledged knowing that it was illegal to lie about or to omit information from United States immigration documents. (J.A. 350, 353.)

Ess stated that she accurately performed her translation services during Vidacak's post-arrest interview. (J.A. 383-84, 388.) Ess testified as to her professional experience, and explained that she had worked for the "U.S. Department of State Language Services" since 1977, and also had served as an interpreter in the federal courts since 1990. (J.A. 379.)

In his motion *in limine* and in his arguments at the pretrial hearing, Vidacak argued that Agent Coulston's testimony should be excluded unless interpreter Ess was available for cross-examination at trial. (Paper No. 12, at 1-2; J.A. 23.) Because Ess did testify at trial, and there was no showing that Ess should be treated as anything other than as a "language conduit," the district court properly admitted Agent Coulston's testimony.

## VI.

For the foregoing reasons, the district court did not err in receiving into evidence the military records in question and the testimony of government witnesses concerning translated

statements made by Vidacak. Accordingly we affirm the verdicts of guilty on all four counts of the indictment.

*AFFIRMED*