**A.I. TRADE FINANCE, INC., Plaintiff,**

v.

**CENTRO INTERNATIONALE
HANDELSBANK AG,**
Defendant.

No. 89 CIV. 7664.

United States District Court,
S.D. New York.

May 9, 1996.

Michael T. Sullivan, Zeichner, Ellman & Krause, New York City, for Plaintiff.

Gilbert A. Samberg, Rosenman & Colin LLP, New York City, for Defendant.

## OPINION & ORDER

SCHWARTZ, District Judge:

Plaintiff A.I. Trade Finance ("AITF") brings this action pursuant to Title 28, United States Code, Section 2201 seeking a declaratory judgment relating to its sale of negotiable instruments to defendant Centro Internationale Handelsbank AG ("Centro"). Defendant asserts eight counterclaims for relief. This matter is currently before the Court on plaintiff's motion to dismiss for lack of subject matter jurisdiction or, in the alternative, for summary judgment, and defendant's cross-motion to strike a foreign judgment from the record as impermissible hearsay.[1] For the reasons stated below,

---

1. Centro also moves to strike from the record plaintiff's supplemental statement made pursuant

plaintiff's motion to dismiss the action for lack of subject matter jurisdiction is denied; plaintiff's motion for summary judgment is granted in part and denied in part; and defendant's motion to strike the foreign judgment from the record is denied.

The Court exercises jurisdiction over this action pursuant to Title 28, United States Code, Section 1332 (alienage).

## BACKGROUND

### I. The Transactions

This action concerns a "forfaiting" transaction, in which Centro purchased three promissory notes (the "Notes") from AITF, each having a face value of $2.5 million. In a back to back transaction, Centro sold the Notes to Amro Handelsbank AG ("Amro") on terms similar to those between AITF and Centro. The facts as alleged by the parties, or as otherwise reflected in the record, are as follows.[2]

In January 1989, the Notes were executed in favor of Welfin S.A. ("Welfin"), a Swiss investment bank, by a Greek entity called Nissilios Shipping Co. ("Nissilios"), ostensibly in order to finance the purchase of electronic equipment to be used in the construction of the vessel M.V. NISSILIOS. The Notes had maturities of October 1989 and January 1990, and were each backed by the "guarantee per aval" of Petra Bank ("Petra") of Jordan. The domicile of payment of the Notes was stated to be Irving Trust Company in New York.

"Forfaiting" or "a forfait" financing is described by Centro as follows. Forfaiting generally involves the discounting of a negotiable instrument issued to finance the importation of goods or services, for the most part to lesser developed countries. In such forfaiting transactions, where the importer requires financing terms and the exporter of the goods is unwilling to finance the purchase itself, the exporter may arrange to receive payment in the form of a negotiable instrument with a short to medium term tenor, and to sell the instrument (of which it is payee) at

a discount from face value to a "primary forfaiting" company. The primary forfaiter may either hold the instrument to maturity and receive full face value, or sell the instrument on the secondary forfaiting market at a lesser discount "without recourse" to the seller. Generally, the instrument will be irrevocably and unconditionally guaranteed by the importer's bank, which puts its endorsement on the face of the instrument along with the notation "per aval". With its aval, the bank becomes the principal obligor on the instrument, and forfaiters in the primary and secondary forfaiting markets rely primarily on the bank's aval rather than the issuer in considering the notes. Often, a forfaiting company will agree to purchase an avalized instrument from another forfaiter "under reserve". This means that the purchaser has committed to purchase the instrument, subject to one or more conditions that must be satisfied before payment is made, or, if payment has already been made, before the seller is entitled to retain the transferred funds.

On January 11 and 12, 1989, AITF agreed to purchase the Notes, plus three additional promissory notes issued by Nissilios, from Welfin subject to a reserve relating to the receipt of "satisfactory documentation." On January 23, 1989, AITF transferred funds in payment for the Notes to Welfin under reserve, and nine days later lifted the reserve, completing the transaction. On or about January 12, 1989, the same day AITF conditionally agreed to purchase the Notes from Welfin, AITF offered to sell the Notes to Centro. AITF represented that the Notes had been issued by Nissilios and were unconditionally and irrevocably guaranteed by Petra per aval. AITF also represented that the underlying transaction was "trade-related", specifically, to "the purchase of various electronics and other components required for the completion of the vessel M.V. NISSILIOS." Plaintiff's Supplemental Rule 3(g) Statement, Ex. F.

to Local Civil Rule 3(g), which refers extensively to the foreign judgment.

**2.** The Court has attempted to summarize those facts that are most significant to the issues raised

by the parties' motions, and does not purport to describe each communication or act by or between the parties to the relevant transactions.

According to AITF, Centro solicited purchasers for the Notes before committing itself to buying them. AITF claims that on or about January 19, 1989, Centro's offer to sell the Notes was accepted by Amro.

The record reflects that on January 23, 1989, Centro sent a telex to AITF stating that it was pleased to confirm its purchase of the Notes from AITF, "subject to satisfactory documentation—without recourse to yourselves or previous beneficiaries." Plaintiff's Ex. E. On January 24, 1989, AITF telecopied a letter to Centro, together with copies of the Notes and a conformed copy of a January 19, 1989 telex from Petra to AITF confirming various points. AITF stated that the signatures of Welfin and Petra agreed with those in their files, and that the signature of Nissilios was confirmed by Petra. AITF further stated, "[w]e shall require notice of any specific reserves you may wish to place on your payment, and we reserve the right not to accept any particular point." Plaintiff's Ex. F.

Centro alleges that on or about January 27, 1989, AITF responded to questions Centro had raised pertaining to the underlying transaction by representing to Centro that "we know the Principals of Nissilios Shipping Company and have worked with them actively." Answer and Counterclaims ¶ 23.

On or about January 31, 1989, Centro requested copies of invoices concerning the underlying commercial transaction for which financing was sought. AITF states that it informed Centro that the bulk of the anticipated purchases was not yet consummated, as the financing was intended to underwrite an ongoing acquisition program, but it offered to assist Centro in obtaining copies of invoices as they were generated. AITF further claims that Centro did not request, and AITF did not agree, that delivery of actual invoices was a condition of Centro's payment or a limitation on AITF's right to retain payment. Centro, on the other hand, claims that its payment to AITF was subject to its receiving the requested invoices.

On February 2, 1989, prior to Centro's transmitting payment to AITF, Amro confirmed to Centro its payment of $6,771,368.63 "at 2/3/89" to Centro's account at the Irving Trust Company in New York in consideration of the Notes. Amro stated that this transfer of funds was made to Centro

"on condition that Petra Bank, Amman, verify to us that

a) Payment will be made as per the guaranteed promissory notes even if the underlying transaction does not succeed;

b) All transfer approvals do exist;

c) The signatures of the drawer on the bills of exchange are legally binding."

Plaintiff's Ex. G.

On February 3, 1989, Centro confirmed to AITF by telex that it had transferred $6,740,989.59 to AITF's account with Chemical Bank in New York on that day, in consideration of the Notes. Centro stated in this telex:

this transfer has be [sic] made subject to receipt of a confirmation from petrabank, amman, that

— payment of the resp. promissory notes will be effected on the respective maturity dates, even if the underlying contract does not materialize

— all authorizations and registrations necessary in jordan and greece for payment of funds upon maturity in effective usd have been obtained respectively filed.

— the signatures of the issuer of the promissory notes are legally and valid for and constituting an obligation of nissilios shipping company, piraeus.

as agreed you will submit copies of the resp. invoices to us.

Plaintiff's Ex. H.

By letter dated February 10, 1989, Amro confirmed to Petra that it had purchased the Notes from Centro without recourse to the seller or previous holders. Amro stated that the Notes had been endorsed from Welfin to the order of AITF, from AITF to Centro, and finally from Centro to Amro. Amro informed Petra that it would present the Notes upon maturity at Irving Trust Company, New York, and that it "would be grateful to receive" Petra's confirmation that (1) it acknowledged Amro as the bona fide holder of the Notes; (2) the Notes were duly issued and legally binding on Nissilios; (3) Petra's

aval represented its irrevocable and unconditional guarantee to pay the Notes upon maturity regardless of the underlying transaction; (4) the aval signatures were supplied by persons at Petra authorized to do so; and (5) the aval was given in conformity with the official exchange regulations of Jordan "and all necessary authorizations have been obtained for the free transfer of funds *together with a copy in writing of the acknowledgement of the Central Bank of Jordan, that they are aware of the issuance of your aval.*" Plaintiff's Ex. I (emphasis supplied). It appears that this was the first time that Amro, or any other party to the transactions, asked to receive a document containing the acknowledgement of the Central Bank of Jordan that it was aware of Petra's aval on the Notes. Petra responded to Amro on February 20, 1989 by confirming the five points noted above, including that Amro was the bona fide holder of the Notes, and that Petra was permitted to enter into this type of transaction and had the authority under existing regulations to pay the Notes upon maturity and to transfer the funds freely to Amro. However, Petra further stated that, "[i]t is not our policy to give copies of correspondence between ourselves and any regulating authorities to third parties. This transaction was not booked on the first place with any specific request for any such copies." Plaintiff's Ex. J.

Centro claims that on February 28, 1989, AITF sent to Centro pro forma invoices,[3] most of which were dated several months prior to the issuance of the Notes. AITF requested that Centro acknowledge receipt of the invoices and confirm that they satisfied Centro's request for invoices concerning the underlying commercial transaction. Centro did not consider the pro forma invoices to have satisfied their request.

On March 15, 1989, Centro notified AITF that it had not yet received proof that all authorizations and registrations necessary in Jordan and Greece for payment of the funds upon maturity in United States dollars had been obtained and filed (as Amro had requested directly from Petra on February 10,

1989), or a confirmation from Petra signed by *two* authorized persons that Petra agreed with the assignment of the Notes by Centro to Amro. Centro also noted that it still awaited invoices showing that the actual delivery of goods to Nissilios had taken place. Centro claims that it demanded a resolution of the outstanding points by March 27, 1989 and restated its reservation of the right not to accept the transaction if all points were not resolved to its satisfaction by that date.

The next day, AITF wrote to Petra requesting its assistance in providing the confirmations requested by Amro and Centro, attaching Centro's March 15 letter to AITF. AITF stated that, "[a]s you can see from the attached documentation we are risking to have to take the transaction back if by March 27, 1989, your confirmation has not been received which we—for both our institutions and our reputations—would want to avoid." Answer and Counterclaims ¶ 27; Plaintiff's Supplemental Rule 3(g) Statement, Ex. A at ¶ 47 (plaintiff's original 3(g) statement).

On March 17, 1989, Petra sent a letter in response to AITF's request, referring to and enclosing its February 20 letter to Amro, in which it stated that it was permitted to enter into such a transaction and had authority to pay the Notes upon maturity, but that it was not the bank's policy to give copies of correspondence between it and regulatory bodies to third parties. AITF transmitted this communication to Centro on March 20, 1989.

AITF claims that on or about April 7, 1989 Centro stated in a telefax to Amro that Amro had received a letter from Petra, dated March 15, 1989, confirming that Petra would honor the Notes, that Petra was permitted to enter into such a transaction and had received the relevant authorization to do so, and that the signatures of the drawer on the Notes were legally binding. According to AITF, Centro stated, "[w]e therefore assume that you are now satisfied with the documentation and consider the conditions revoked." Plaintiff's Ex. A at ¶ 51. Further, AITF claims that on or about April 14, 1989, in a letter to Amro, Centro acknowledged that the documents forwarded by AITF to Centro

---

**3.** According to Centro, a pro forma invoice is a non-binding pricing indication by a vendor to a

potential purchaser and does not represent confirmation of a binding agreement.

satisfied the reserves and that the original conditions did not require actual submission of the foreign exchange transfer approvals, only confirmation from Petra that such approvals existed.

Centro alleges that on April 14, 1989, it informed AITF that the documentation of the transaction was unsatisfactory and requested that AITF contact Centro for purposes of reversing the transaction. AITF strongly objected to reversing the transaction and stated that it could not understand why Centro did not accept the representation of Petra that it possessed the requisite authority to enter into the transaction and make payment on the Notes upon maturity. Centro claims that AITF continued in its attempt to obtain the documents requested by Centro and Amro, contacting Welfin on April 17, 1989 and requesting copies of actual invoices in the underlying transaction, as well as Welfin's assistance in getting Petra to provide copies of the foreign exchange transfer approvals.

AITF alleges that in a telefax to Amro dated April 17, 1989, Centro affirmed its satisfaction with the documentation provided by AITF and Petra; and that in a further telefax to Amro dated April 25 1989, Centro urged Amro to lift its reserves because the documentation met market requirements for forfaiting transactions. In addition, AITF claims that in correspondence between Centro and Amro in May 1989, Centro, more than once, urged Amro to lift its reserves, arguing that the condition of receiving copies of correspondence between Petra and the Central Bank of Jordan was not justified.

On April 24, 1989, AITF repeated its request that Centro lift its reserves on its transmittal of funds to AITF. Centro refused. On April 25, 1989, Centro stated to AITF that, since the transaction was guaranteed by a bank not domiciled in the country of the issuer of the Notes, Centro insisted on receiving a copy of an acknowledgement by the Central Bank of Jordan to Petra that all approvals necessary for the transaction in

Jordan had been obtained. AITF refused to reverse the transaction.

On or about August 3, 1989, control of Petra was seized by the Jordanian authorities. Centro alleges that on October 4, 1989, the Governor of the Central Bank of Jordan announced that an investigation into Petra had uncovered fraud, including violations of Jordanian foreign exchange laws.

On October 17, 1989—the maturity date of one of the Notes—Amro apparently sought payment on the Note, but both Nissilios and Petra dishonored it.[4] Subsequently, the Central Bank of Jordan stated that it had not acknowledged the issuance of the Notes or approved the transaction, and that a Jordanian commercial bank or financial institution is not permitted to establish any obligation in foreign currency unless it obtains the approval of the Central Bank of Jordan and fulfills certain conditions. On October 25, 1989, the new management of Petra stated that Petra's avals on the Notes had not been approved by the Central Bank of Jordan, and, therefore, constituted a violation of bank regulations.

## II. *The Legal Proceedings*

Centro states that in November 1989, AITF again refused to reverse its transaction with Centro. Instead, AITF commenced this action for a declaratory judgment against Centro. In addition, AITF, as holder of three additional promissory notes issued by Nissilios and avalized by Petra, brought a second action against Petra in the Southern District of New York.[5]

Amro apparently made demands upon Centro for reversal of the Centro–Amro transaction more or less parallel to the demands Centro made upon AITF for reversal of the AITF–Centro transaction. *See* Answer and Counterclaims ¶ 53. Following the dishonor of the Notes by Petra and Nissilios, Amro commenced an action against Centro in Vienna, Austria, seeking the reversal of its transaction with Centro plus interest and costs (the "Vienna Action"). Amro has not

---

**4.** The two remaining Notes were dishonored by Nissilios and Petra when they were presented for payment on their maturity date, January 17, 1990.

**5.** *See A.I. Trade Finance, Inc. v. Petra Bank,* 89 Civ. 7987 (JFK).

alleged any claims against AITF before any court.

In response to AITF's request for a declaratory judgment of non-liability, Centro asserts eight counterclaims against AITF, sounding in breach of contract, breach of express warranty, breach of implied warranty, misrepresentation, negligence, conversion, unjust enrichment, and mutual mistake of fact. Centro demands judgment as follows:

A. Awarding damages to Centro in an amount in excess of $8 million, with the exact amount to be proved at trial, together with interest, costs, and reasonable attorneys' fees; *and/or*

B. Ordering AITF to make restitution to Centro of all moneys received by AITF from Centro relative to the Transaction, together with interest thereon, in return for restitution to AITF of the Notes, plus costs and reasonable attorneys' fees; *and/or*

C. Declaring that AITF is liable to Centro, and that if Centro is obliged or required to reverse the Centro–Amro transaction, or to pay damages to Amro, then AITF is required correspondingly to reverse the AITF–Centro transaction, or to pay damages to Centro; *and*

D. Awarding to Centro as damages its actual costs, expenses, and attorneys' fees incurred relative to the Vienna Suit;

E. Awarding to Centro punitive damages;

F. Awarding to Centro appropriate interest, costs and expenses, including reasonable attorneys' fees, and such other and further relief as the Court deems just and proper.

Answer and Counterclaims at 27–28 (emphasis supplied).

Centro moved for partial summary judgment on its claims of breach of contract, breach of warranty and conversion. In a Memorandum and Order signed by Judge Leval on September 29, 1992, the Court denied Centro's motion, citing the existence of genuine issues of material fact in dispute.

On August 29, 1994, the Commercial Court in Vienna issued a judgment rejecting Amro's complaint against Centro and determining that Centro was not liable to Amro (the "Vienna Judgment"). Amro appealed the judgment in October 1994. However, prior to a ruling by the Austrian appellate court, Amro and Centro entered into a settlement agreement on July 3, 1995. Pursuant to the settlement agreement, Centro agreed to pay Amro $3,000,000 and to assign to Amro Centro's claims against AITF in this action. In turn, Amro withdrew its appeal and re-assigned to Centro the claims against AITF in this action for collection. Further, Amro agreed to deliver and endorse the Notes to Centro "without recourse". In a separately executed agreement concerning the prosecution of this action, Amro agreed to pay the past, present and future costs incurred by Centro in this action up to an amount of $2,000,000. Centro agreed to pass on to Amro all payments and any performance received from AITF resulting from a judgment or settlement in this action; such that, Centro is entitled to retain 50% of all payments made by AITF, if any, up to $8,000,000 and 25% of all such payments by AITF exceeding $8,000,000, being obligated to pay the remainder to Amro. *See* Plaintiff's Ex. N.

Following the judgment of the lower court in Vienna, AITF moved to dismiss this action for lack of subject matter jurisdiction, on the ground that there was no case or controversy between the parties since the Vienna court had dismissed Amro's claims against Centro. Before a ruling on this motion was rendered, Centro informed the Court that Amro and Centro had settled the Vienna Action on the terms noted above. At a conference held on October 5, 1995, the Court requested briefing on the preclusive effect, if any, of the Vienna Judgment, and permitted AITF to present its argument in the form of a motion for summary judgment. Thus, AITF moves for summary judgment on the ground that the doctrine of judicial estoppel prevents Centro from advancing arguments that contradict those it successfully asserted in the Vienna Action, thereby precluding Centro's claims. In addition, AITF renews its argument that the action should be dismissed for lack of subject matter jurisdiction. Centro cross-moves to strike the Vienna Judgment from the record as hearsay.

## I. Subject Matter Jurisdiction

▮ The Court first addresses AITF's motion to dismiss for lack of subject matter jurisdiction. AITF argues that its declaratory judgment action and Centro's counterclaims were rendered moot by the Vienna Judgment in Centro's favor. AITF contends that since Centro was not required to pay damages to Amro, or rescind the Centro–Amro transaction, Centro has not suffered any damages relating to its transaction with AITF, so that no case or controversy exists between the parties. AITF characterizes Centro's counterclaims as seeking indemnity from AITF for its losses, if any, from the Centro–Amro transaction. AITF submits that a claim sounding in indemnity is ripe for resolution only after the indemnitee's payment to a claimant. *See Plantronics v. United States,* No. 88 Civ. 1892 (KMW), 1990 WL 3202 at *1 (S.D.N.Y. Jan. 9, 1990) (damages are speculative and case is hypothetical until indemnitee is required to make payment to claimant); *Bay Ridge Air Rights, Inc. v. State,* 44 N.Y.2d 49, 54, 404 N.Y.S.2d 73, 75, 375 N.E.2d 29, 30–31 (1978) (cause of action for indemnity does not accrue until payment is made). Thus, armed with the Vienna Judgment vindicating Centro in the Centro–Amro transaction, AITF finds itself in the unusual position of asserting that the Court lacks subject matter jurisdiction over the action that AITF itself commenced.[6]

Centro counters that its claims against AITF do not seek indemnification, but rather concern whether AITF breached its duties to Centro in connection with the AITF–Centro transaction, and whether AITF is therefore liable to Centro for money damages or for restoration of the *status quo ante.* The only possible significance of the Vienna Judgment to Centro's counterclaims, it argues, is the measure of damages resulting from AITF's liability to Centro, but not the existence of that liability.

▮ Under the Federal Declaratory Judgments Act, Congress has authorized declaratory judgments only "[i]n ... case[s] of actual controversy." 28 U.S.C. § 2201. The test to be applied is that stated by the Supreme Court in *Maryland Casualty Co. v. Pacific Coal & Oil Co:*

> the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*Id.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941); *see also Lake Carriers' Ass'n v. MacMullan,* 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257 (1972); *Olin Corp. v. Consolidated Aluminum Corp.,* 5 F.3d 10, 17 (2d Cir.1993). The controversy must be "real and substantial ... admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). Whether a real and immediate controversy exists in a particular action is a matter of degree and must be determined on a case-by-case basis. *Kidder, Peabody & Co. v. Maxus Energy Corp.,* 925 F.2d 556, 562 (2d Cir.), *cert. denied,* 501 U.S. 1218, 111 S.Ct. 2829, 115 L.Ed.2d 998 (1991).

The Court finds that this case satisfies the requirement that there be a real and substantial controversy between the parties. Aside from Centro's claims for damages relating to the actual transaction of the Notes, it seeks incidental and consequential damages from AITF measured by the cost of Centro's investigation and litigation expenses in the Vienna Action. Centro has incurred these expenses, which apparently amount to approximately $1,000,000,[7] and claims that it was forced to defend the Vienna Action be-

---

6. AITF also argues that the settlement agreement between Centro and Amro should be denied effect by the Court as collusive and against public policy. This Court has no authority to void the Centro–Amro settlement agreement and declines AITF's invitation to declare it to be collusive or violative of public policy.

7. Centro has not explicitly stated that it will seek to recover the expenditures relating to its settlement with Amro, or provided authority showing that settlement costs may be included in a claim for damages resulting from the defense of a third party action.

cause AITF wrongfully refused to unwind the transaction.

Under New York law,[8] a party alleging breach of contract may bring suit to recover the damages awarded against it in a prior action brought by a third party, and also the legal expenses incurred by it in defending that action, where the alleged breach of contract generated the prior action. *Cooper v. Weissblatt,* 154 Misc. 522, 531, 277 N.Y.S. 709, 720 (N.Y.App. 2d Dept.1935); *see also Ingersoll Milling Mach. Co. v. M/V Bodena,* 829 F.2d 293, 309 (2d Cir.1987), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 774, 98 L.Ed.2d 860 (1988) ("Where a breach of contract has caused a party to maintain a suit against a third person, courts have permitted recovery from the breaching party of counsel fees and other litigation expenses incurred in the suit"); *Jamaica Commodity Trading Co. Ltd. v. Connell Rice & Sugar Co., Inc.,* 766 F.Supp. 138, 157 (S.D.N.Y.1991) (where breach by defendant directly caused arbitration action between plaintiff and third party, plaintiff is entitled to attorney's fees and other expenses incurred as a result of arbitration action); *Vaughan v. Atkinson,* 291 F.2d 813, 815 (4th Cir.1961), *rev'd on other grounds,* 369 U.S. 527, 82 S.Ct. 997, 8 L.Ed.2d 88 (1962) ("The general rule is that in suits for breach of contract counsel fees may be allowed to the plaintiff if he can show that defendant's breach of contract has caused litigation against third parties in which the plaintiff has been obliged to secure the services of counsel") (citing, *inter alia,* 5 Corbin on Contracts § 1037; Restatement of Contracts, Vol. 1, § 334; 15 Am.Jur., Damages, 142). Moreover, where the litigation

expenses are "part and parcel of the damages stemming from the defendant's alleged breach of contract," the claim for such damages survives even if the underlying claim for breach of contract is dismissed as moot.[9] *A.I. Trade Finance v. Petra Intern. Banking Corp.,* 62 F.3d 1454, 1466 (D.C.Cir.1995).

Centro claims that AITF's actions in (1) not fulfilling the conditions Centro alleges it placed on the Notes transaction and (2) refusing to reverse the AITF–Centro transaction, caused Centro to be forced to defend itself against Amro in Vienna. Centro's expenses in litigating the Vienna Action are part and parcel of the damages stemming from the alleged breach. Thus, even though the Court holds below that Centro's claims for damages relating to the Notes transaction are dismissed as moot, *see infra* at 391, Centro's claim for its costs, expenses and attorneys' fees incurred relative to the Vienna Action survives.

This remaining damages claim constitutes a controversy between the parties and, therefore, confers subject matter jurisdiction upon the Court. Accordingly, AITF's motion to dismiss the complaint and counterclaims for lack of subject matter jurisdiction is denied.

## II. *The Vienna Judgment*

Centro moves to strike the Vienna Judgment and plaintiff's supplemental Rule 3(g) statement, which refers extensively to the Vienna judgment, from the record as impermissible hearsay. Centro argues that a prior civil judgment may be admitted into evidence only pursuant to Federal Rule of Evidence 803(23),[10] which provides:

---

8. The parties have not formally briefed the issue of what law should apply to the AITF–Centro transaction; however, AITF's Complaint alleges that the transaction occurred in New York and that the Notes were payable in New York. Although Centro denies these allegations in its Answer, in its Counterclaims Centro alleges that its claims arose in the Southern District of New York and that the Notes were payable in New York.

9. In order to recover such damages, however, Centro must prove its underlying claim(s) that AITF breached its duties to Centro. *See Jamaica Commodity Trading Co. Ltd.,* 766 F.Supp. at 157–58.

10. Centro cites a passage from Weinstein's *Evidence,* which states that "[p]rior civil judgments are inadmissible, except to the limited extent provided by Rule 803(23), or as given effect by the substantive doctrine of res judicata which lies outside the scope of rules of evidence." 4 Weinstein *Evidence* § 803(22)[01] (1994). Centro has taken this passage out of context, however, since it is found in a discussion relating to the admissibility of prior convictions in a *criminal* case. The sentence following the one Centro relies on reads, "[c]ivil judgments are not given evidential effect because the lower applicable burden of proof makes them less reliable than criminal judgments." *Id.*

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . . .

(23) . . . Judgments as proof of matters of personal, family or general history, or boundaries, essential to the judgment, if the same would be provable by evidence of reputation.

F.R.E. 803(23). Since the Vienna Judgment does not fit within this exception to the hearsay rule, Centro contends, it must be stricken from the record. In addition, Centro submits, and AITF does not dispute, that the Vienna Judgment has no res judicata or collateral estoppel effect due to the settlement agreement between Amro and Centro, which, under Austrian law, renders the Vienna Judgment a nullity.[11]

■ AITF responds that the Vienna Judgment is not offered as evidence to prove the truth of the matter being asserted and, therefore, it does not constitute hearsay. *See* F.R.E. 801(c). Rather, AITF states that it offers the Vienna Judgment to prove the fact of Centro's *assertions* in the Vienna Action, which is an element of AITF's argument that Centro is judicially estopped from making contrary assertions to this Court. In the alternative, AITF contends that the Vienna Judgment is admissible pursuant to Rule 803(24), which provides for the admissibility of statements that are not specifically covered by other hearsay exceptions but that have equivalent circumstantial guarantees of trustworthiness.

■ The Court finds that AITF may refer to the Vienna Judgment as support for its judicial estoppel argument, since, as such, the judgment is not being offered for the truth of the matter asserted. Moreover, the Court holds that the Vienna Judgment is admissible into evidence pursuant to Federal Rule of Evidence 201 to prove that it was rendered and as prima facie evidence of the facts adjudicated.

Rule 201 allows a court to take judicial notice of adjudicative facts. The Second Circuit has noted that Rule 201 permits a court to take judicial notice of a foreign judgment. *Sprague & Rhodes Commodity Corp. v. Instituto Mexicano Del Cafe,* 566 F.2d 861, 862 (2d Cir.1977). In *United States v. Garland,* 991 F.2d 328 (6th Cir.1993), the court took judicial notice of a criminal judgment in Ghana against Ghanian citizens who had defrauded the defendant in a United States criminal case. The Sixth Circuit stated that,

[t]he Ghanian judgment is admissible in evidence to prove that it was rendered and as prima facie evidence of the facts adjudicated. . . . Rule 201 applies to judicial notice of "adjudicative facts." We judicially notice the criminal judgment in Ghana and its existence as an official statement usable in evidence of the facts stated. We do not judicially notice the *truth* of the statements contained in the Ghana judgment *because some of these facts may remain in dispute.*

*Id.* at 332 (citation omitted) (emphasis supplied); *see also United States v. Jones,* 29 F.3d 1549, 1553 (11th Cir.1994) (court may take judicial notice of another court's order for the purpose of recognizing the judicial act but not to recognize that court's findings of fact as true); *Liberty Mutual Ins. Co. v. Rotches Pork Packers, Inc.,* 969 F.2d 1384, 1388 (2d Cir.1992) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings"); *Amsterdam v. Goldreyer, Ltd.,* 882 F.Supp. 1273, 1279 (E.D.N.Y.1995) (court may take judicial notice of prior judgment but not of the truth of the court's findings concerning disputed questions). The court in *Garland* further noted that, "[a]s with records falling under the public records exception, a foreign judgment that shows no sign of being unreliable should be admitted." *Garland,* 991 F.2d at 335. Once a foreign judgment is admitted, it is treated as prima facie evidence of the facts and opinions contained therein, and the opposing party is free to rebut these facts and opinions with evidence of its own. *Id.*

---

11. AITF points out, however, that Amro and Centro opted to enter into a "court settlement" rather than an "extra-judicial settlement". According-ing to AITF, the latter type of settlement leaves the court's judgment intact and preserves its preclusive effect under Austrian law.

The Court sees no reason to doubt the trustworthiness of the Vienna Judgment, and Centro suggests none. Therefore, the Court takes judicial notice of the Vienna Judgment for the purpose of recognizing its existence as an official statement, usable as evidence of the facts and opinions stated therein. The Court does not, however, judicially notice the *truth* of the facts and opinions stated in the judgment. At a trial on the merits of this action, AITF will have the task of proving, and Centro of rebutting, the truth of the facts and opinions contained in the Vienna Judgment.

Accordingly, Centro's motion to strike the Vienna Judgment, as well as AITF's supplemental statement referring to the same, is denied.

### III. *Judicial Estoppel*

AITF moves for summary judgment on the ground that the doctrine of judicial estoppel precludes Centro from maintaining positions in this action that contradict those it advanced in Vienna that were adopted by the Vienna court. AITF refers to the Vienna Judgment itself to glean the arguments Centro made to that court and their results.

Centro submits in opposition that, in reality, AITF's argument relies on the doctrines of res judicata and collateral estoppel and must fail because the Vienna Judgment has no preclusive effect under Austrian law. Further, Centro argues that judicial estoppel is not a clearly recognized doctrine in the Second Circuit, and even if it is a viable doctrine, AITF does not satisfy the prerequisites for its application. Centro contends that in order to invoke the doctrine of judicial estoppel AITF must show that (1) Centro has received the benefit of a final judgment in the Vienna Action; (2) Centro stated under oath in its litigation against Amro that a fact was "X" and stated under oath in this action that the same fact was "not X", because judicial estoppel only applies to sworn statements of adjudicative fact, not statements of opinion or conclusions of law; (3) the Vienna court made express findings of fact, upon which its judgment was squarely based, in accordance with the irreconcilable sworn fact statements in question; and (4)

AITF relied to its detriment on a statement regarding a factual issue that Centro made in the Vienna Action.

■ The Second Circuit recognizes that the doctrine of judicial estoppel "protects the sanctity of the oath and the integrity of the judicial process" by preventing a party "from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding." *Bates v. Long Island R.R. Co.*, 997 F.2d 1028, 1038 (2d Cir.), *cert. denied*, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 452 (1993); *see also Axa Marine & Aviation Ins. (UK) Ltd. v. Seajet Indus., Inc.*, 891 F.Supp. 978, 984 (S.D.N.Y.1995) ("A litigant should not be permitted to lead a court to find a fact one way and then contend in another judicial proceeding that the same fact should be found otherwise"). There are two distinct objectives behind judicial estoppel: the preservation of the "sanctity of the oath," which is accomplished by "demanding absolute truth and consistency in all sworn positions," and the protection of judicial integrity, which would be compromised by the rendering of inconsistent results in two proceedings. *Bates*, 997 F.2d at 1038.

■ The court in *Bates* determined the elements of the doctrine to be as follows:

[f]irst, the party against whom the estoppel is asserted must have argued an inconsistent position in a prior proceeding; and second, the prior inconsistent position must have been adopted by the court in some manner.

*Id.; see also Servidone Constr. Corp. v. St. Paul Fire & Marine Ins. Co.*, 911 F.Supp. 560, 577 (N.D.N.Y.1995) (same).

In *Bates*, plaintiff Malachy Lyons, Jr. had brought a previous action against the defendant under the Federal Employers' Liability Act ("FELA"). At the trial of his FELA claim, Lyons' treating physician testified that he was permanently disabled from physical labor. When the Long Island Railroad ("LIRR") subsequently discharged Lyons on the ground that he was physically disqualified from performing his former job, Lyons claimed in the *Bates* action that the LIRR had discriminated against him because of his

disability. In support of his claim, Lyons submitted a treating physician's affidavit that contradicted the treating physician's testimony at the FELA trial. Consequently, the court ruled that the first element of the doctrine applied to Lyons' case. *Bates,* 997 F.2d at 1038. The Second Circuit held that the second element, however, did not apply because Lyon's FELA action settled before the jury rendered a verdict on damages. The court stated that, "[a] settlement neither requires nor implies any judicial endorsement of either party's claims or theories, and thus a settlement does not provide the prior success necessary for judicial estoppel." *Id.* (citations and internal quotations omitted); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Georgiadis,* 903 F.2d 109, 114 (2d Cir.1990) (judicial estoppel applies "only if the party against whom the estoppel is claimed actually obtained a judgment as a result of the inconsistent position"); *McSherry v. Giannuzzi,* 717 F.Supp. 238, 242 (S.D.N.Y.), *appeal denied,* 889 F.2d 1098 (Fed.Cir.1989) (party against whom doctrine is invoked must have been successful in the prior proceeding, or at least have received some benefit from the "previously taken inconsistent position").

Notably, in *Bates* the Second Circuit omitted "reliance" as an element of judicial estoppel, and there is little support in the caselaw for the proposition that reliance is a required element of the doctrine in the Second Circuit. In a decision pre-dating *Bates,* the court noted that the fact that the party asserting judicial estoppel had not relied to their detriment on their adversary's initial position was one reason, among many, to reject the claim of judicial estoppel. *See Young v. U.S. Dep't of Justice,* 882 F.2d 633, 639–40 (2d Cir.1989), *cert. denied,* 493 U.S. 1072, 110 S.Ct. 1116, 107 L.Ed.2d 1023 (1990). The court in *Merrill Lynch v. Georgiadis* specifically stated that reliance was an element in the distinct doctrine of equitable estoppel, but made no

such observation concerning judicial estoppel. *Id.,* 903 F.2d at 114. In *McSherry v. Giannuzzi,* another case cited by Centro, the court observed that reliance and prejudice are essential elements of judicial estoppel *in the Federal Circuit. Id.,* 717 F.Supp. at 242. In short, this Court holds that the doctrine of judicial estoppel presents a viable claim in this Circuit and the elements required for such a claim in the Second Circuit are those specified by the court in *Bates, supra.*

■ Thus, in order to meet its burden of establishing that judicial estoppel is appropriate to prevent Centro from asserting its counterclaims, AITF must show that in the Vienna Action Centro argued a position inconsistent with that which it takes here, and that this position was adopted by the Vienna court in its judgment.[12] AITF refers the Court to the text of the Vienna Judgment in support of its judicial estoppel claim.[13] AITF urges that since the Vienna court found that Centro satisfied its conditions vis a vis Amro, it necessarily follows that AITF satisfied the "essentially similar" conditions of Centro. *See* Plaintiff's Mem. of L. at 16. Furthermore, AITF argues, to the extent that Amro and Centro's reserves were different, the differences were not material, so their non-performance should be excused.

■ Having reviewed the Vienna Judgment and the claims made by the parties to the instant action, the Court finds that judicial estoppel should be applied in a limited fashion to Centro's claims in this case. The Vienna court noted that, in response to Amro's claims for breach of contract and warranty, Centro "answers that the confirmation provided by Petra Bank upon the request of Plaintiff was substantively complete and that it satisfied the reserve agreed upon on Feb. 2, 1989, and that Plaintiff had no right to claim from Petra Bank declarations or documents that exceeded the reserve of Feb. 2, 1989."[14] Plaintiff's Ex. J. at 4

---

**12.** The fact that Centro and Amro settled their dispute after the Vienna Judgment was rendered is irrelevant. The Vienna court reached a decision in that action, thereby according success to Centro. *See Bates,* 997 F.2d at 1038.

**13.** AITF requests that, if the Court finds that the Vienna Judgment does not adequately support its

judicial estoppel claim, it be permitted to conduct discovery of the pleadings and other relevant documents in the Vienna Action.

**14.** The Vienna court summarized Centro's positions from its pleadings and the testimony of certain witnesses. *See* Plaintiff's Ex. J at 10 (discussing testimony of Centro employee von

**390**

(translation of Vienna Judgment). The court also states that a Centro employee testified that a request from Amro for a written confirmation from the foreign exchange authorities regarding Petra's aval would have been so unusual that he would remember it. *Id.* at 20. Based on this testimony, the court ruled that written confirmation from the foreign exchange authorities was not a condition of the Centro–Amro transaction, finding specifically that, "it is not customary in the industry, in the process of handling of such forfait businesses, for banks among themselves to demand (over and above a declaration that there was free transferability) a written confirmation from the foreign-exchange authorities." *Id.* at 19–20.

Centro asserts in the instant action that *proof* that all authorizations and registrations necessary in Jordan and Greece for payment of the Notes had been obtained and filed was a reserve in its transaction with AITF. *See* Defendant's 3(g) Statement, Ex. A at ¶ 40. This position is wholly inconsistent with the position Centro advanced in the Vienna Action, which was adopted by the Vienna court. Therefore, in order to preserve the sanctity of the oath and avoid the risk of inconsistent results in the two actions, *see Bates,* 997 F.2d at 1038, Centro is estopped from asserting that receiving proof of the authorizations was a condition of its purchase of the Notes from AITF.

The Vienna court further stated that, according to Centro, Amro knew that its transaction with Centro was a "through trade", and that, accordingly, Centro passed on to Amro all information and documents which it had received from AITF and only passed on to AITF those reserves which had been made by Amro. *See* Plaintiff's Ex. J at 4. With respect to Amro's claims that its transaction with Centro was based on a mutual mistake or breach of warranty, the Vienna court adopted Centro's position that Amro "knew (or, with reasonable professional care, should have known) that the transaction was,

on [Centro's] side, a so-called 'through-deal' transaction, where [Centro] would only pass on to its seller those reserves which were claimed from it." *See id.* at 24.

In the instant action, Centro claims that the production of invoices relating to the underlying commercial transaction was an additional condition that Centro made on its deal with AITF. While this appears to be inconsistent with the position it advanced to the Vienna court, it may be that Centro did not consider its request for invoices relevant to the Vienna Action, even though it considered this to have been a reserve on the AITF–Centro transaction. AITF concedes that Centro's reserves were "essentially similar" to Amro's, not their mirror-image, but asks the Court to rule that the differences are not material. The Court declines to do so.

The nature and extent of Centro's reserves in the AITF–Centro transaction is the core of the parties' dispute. Centro claims that it demanded from AITF, among other things, invoices for the underlying transaction as a condition of its purchase of the Notes. AITF argues that production of the invoices was not a condition of the transaction, or, at least, not a material condition. This constitutes a genuine issue of material fact in dispute in this action. Apparently, this matter was not raised by Centro in the Vienna Action or directly ruled upon by the Vienna court. The Court, therefore, finds that Centro is not estopped from asserting this claim against AITF. Accordingly, it would be inappropriate for the Court to grant summary judgment to AITF based on the ground of judicial estoppel.

IV. *Centro's Claims for Damages Relating to the Notes Transaction are Moot*

Although the Court does not grant summary judgment to AITF based on the doctrine of judicial estoppel, it hereby dismisses

---

Aretin). Although pleadings are not sworn to under oath, presumably they are signed or submitted by counsel, who are officers of the court and practice under a duty to be truthful to the court. Accordingly, if, as Centro contends, judicial estoppel requires that the prior inconsistent

position be set forth in a sworn statement, which is by no means clear from the Second Circuit's decision in *Bates, supra,* the Court finds that the objectives of this requirement, if not the requirement itself, are satisfied.

as moot Centro's claims for damages relating to the AITF–Centro transaction. Having taken judicial notice of the Vienna Judgment, it is clear that Centro has suffered no damages other than those related to the investigation and litigation of the Vienna Action, and only its claim for those damages survives. Centro sold the Notes to Amro at a profit and retains the proceeds from this sale. The Vienna court found in favor of Centro and did not order Centro to rescind its transaction with Amro or to pay Amro its damages. Therefore, the only damages Centro can claim to have suffered are its expenses in litigating the Vienna Action.

As Centro can claim no damages in contract or tort for AITF's alleged breaches of duty, its claims are dismissed as moot to the extent they seek such relief. *See SOS Oil Corp. v. Norstar Bank,* 152 A.D.2d 223, 228, 548 N.Y.S.2d 308, 311 (N.Y.App.Div.2d Dept. 1989), *aff'd,* 76 N.Y.2d 561, 561 N.Y.S.2d 887, 563 N.E.2d 258 (1990) (matter is moot if determination sought would not have practical effect on existing controversy); *NFL Players Ass'n v. Pro Football, Inc.,* 56 F.3d 1525, 1530 (D.C.Cir.1995) (there being no live claim for damages court must dismiss claim as moot). Centro's only remaining claim is one for its attorneys' fees and costs in litigating the Vienna Action. As noted above, *see supra* at 17–19, this claim is viable even though the underlying contract claims are dismissed as moot.

*CONCLUSION*

For the reasons set forth above, plaintiff's motion to dismiss the Complaint for lack of subject matter jurisdiction is denied. Plaintiff's motion for summary judgment is denied in part and granted in part. Defendant's motion to strike the Vienna Judgment from the record is denied. Counsel are directed to appear for a pre-trial conference at the United States Courthouse, Courtroom 14C, 500 Pearl Street, New York, New York on May 20, 1995 at 12:30 p.m. for the purposes of scheduling further proceedings in this action.

SO ORDERED.